**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Martin Albrecht, | ) CIV 11-873-PHX-MHB |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Michael J. Astrue, Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

Pending before the Court is Plaintiff John Martin Albrecht's appeal from the Social Security Administration's final decision to deny his claim for disability insurance benefits. After reviewing the administrative record and the arguments of the parties, the Court now issues the following ruling.[1]

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits pursuant to Title II of the Social Security Act on October 24, 2007, alleging disability beginning June 30, 2000. (Transcript of Administrative Record ("Tr.") at 95-99, 15.)  His application was denied initially and on reconsideration.  (Tr. at 48-53, 59-63.)  On October 23, 2008, he requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 64-65.)  A hearing was held

---

[1]  Plaintiff's request for oral argument will be denied because the parties have fully briefed the issues and oral argument will not aid in the Court's decision.  See Partridge v. Reich, 141 F.3d 920, 926 (9th Cir. 1998); Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Development Corp., 933 F.2d 724, 729 (9th Cir. 1991).

1   on December 1, 2009. (Tr. at 25-47.) On December 11, 2009, an ALJ issued a decision in
2   which he found that Plaintiff was not disabled. (Tr. at 12-24.) Plaintiff requested review of
3   the ALJ's decision. (Tr. at 5-7.)

4      The Appeals Council denied Plaintiff's request, (Tr. at 1-4), thereby rendering the
5   ALJ's decision the final decision of the Commissioner. Plaintiff sought judicial review of
6   the ALJ's decision pursuant to 42 U.S.C. § 405(g).

7                    **II. STANDARD OF REVIEW**

8      The Court must affirm the ALJ's findings if the findings are supported by substantial
9   evidence and are free from reversible legal error. See Reddick v. Chater, 157 F.3d 715, 720
10  (9th Cir. 1998); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence
11  means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might
12  accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401
13  (1971); see Reddick, 157 F.3d at 720.

14     In determining whether substantial evidence supports a decision, the Court considers
15  the administrative record as a whole, weighing both the evidence that supports and the
16  evidence that detracts from the ALJ's conclusion. See Reddick, 157 F.3d at 720. "The ALJ
17  is responsible for determining credibility, resolving conflicts in medical testimony, and for
18  resolving ambiguities." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995); see
19  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989). "If the evidence can reasonably
20  support either affirming or reversing the [Commissioner's] conclusion, the court may not
21  substitute its judgment for that of the [Commissioner]." Reddick, 157 F.3d at 720-21.

22                   **III. THE ALJ'S FINDINGS**

23     In order to be eligible for disability or social security benefits, a claimant must
24  demonstrate an "inability to engage in any substantial gainful activity by reason of any
25  medically determinable physical or mental impairment which can be expected to result in
26  death or which has lasted or can be expected to last for a continuous period of not less than
27  12 months." 42 U.S.C. § 423(d)(1)(A). An ALJ determines a claimant's eligibility for
28  benefits by following a five-step sequential evaluation:

1
2

(1)   determine whether the applicant is engaged in "substantial gainful activity";

3

(2)   determine whether the applicant has a medically severe impairment or combination of impairments;

4
5

(3)  determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

6
7

(4)  if the applicant's impairment does not equal one of the listed impairments, determine whether the applicant is capable of performing his or her past relevant work;

8
9

(5)  if the applicant is not capable of performing his or her past relevant work, determine whether the applicant is able to perform other work in the national economy in view of his age, education, and work experience.

10   See Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (citing 20 C.F.R. § 404.1520).  At the

11   fifth stage, the burden of proof shifts to the Commissioner to show that the claimant can

12   perform other substantial gainful work.  See Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir.

13   1993).

14          At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

15   activity during the period from his alleged onset date of June 30, 2000, through his date last

16   insured of December 31, 2002.  (Tr. at 17.)  At step two, he found that Plaintiff had failed

17   cervical spine syndrome, status post cervical fusion, and occipital headaches that were

18   "severe" impairments within the meaning of the regulations.  (Tr. at 17-18.)  At step three,

19   the ALJ stated that Plaintiff did not have an impairment or combination of impairments that

20   met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix

21   1 of the Commissioner's regulations.  (Tr. at 18.)  After consideration of the entire record,

22   including Plaintiff's allegations of disabling pain and the objective medical evidence, the

23   ALJ found that through the date last insured, Plaintiff retained the residual functional

24   capacity to perform the full range of sedentary work.[2]  (Tr. at 18-23.)  At step four, the ALJ

25   found that through the date last insured, with his residual functional capacity, Plaintiff was

26

27          [2]   "Residual functional capacity" is defined as the most a claimant can do after

28   considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks.

1   capable of performing his past relevant work as a computer hardware designer and help desk

2   technician.  (Tr. at 23.)  Therefore, the ALJ decided that Plaintiff was not disabled through

3   December 31, 2002 – the last date insured.

4                                     **IV.  DISCUSSION**

5        In his brief, Plaintiff contends that the ALJ erred by:  (1) rejecting of the assessment

6   of the treating physician, James H. Diede, M.D., and by instead relying on his own

7   interpretation of the medical evidence, when the vocational expert testified the limitations

8   assessed by the treating physician would preclude sustained work; (2) failing to obtain

9   medical expert testimony pursuant to Social Security Ruling 83-20 regarding the disability

10   onset date; and (3) rejecting Plaintiff's symptom testimony in the absence of clear and

11   convincing reasons for doing so.  Plaintiff requests that the Court remand for determination

12   of disability benefits or, in the alternative, remand for further administrative proceedings.

13   **A.**     **Rejection of Treating Physician's Opinion**

14        Plaintiff first argues that the ALJ erred by rejecting the assessment of treating

15   physician, Dr. Diede, who completed a Medical Assessment of Ability to Do Work Related

16   Physical Activities and a Pain Functional Capacity Questionnaire in November of 2008, (Tr.

17   at 836-44), and found that Plaintiff could only stand for less than two hours in an eight-hour

18   workday and sit for about six hours in an eight-hour workday, (Tr. at 836); noted that

19   Plaintiff was "[u]nable to move cervical spine beyond 30 [degrees] [left] rotation, 45

20   [degrees] [right] rotation without experiencing pain – neck pain over cervical facets and

21   cervicogenic occipital cephalgia," (Tr. at 838), and assessed severe pain that frequently

22   interfered with attention and concentration, leading to failure to complete tasks in a timely

23   manner, (Tr. at 839-40).  In his pleadings, Plaintiff specifically states that "[t]he error is that

24   the ALJ's finding was based on his *own* medical opinion, the ALJ's own view of the medical

25   record."

26        "The ALJ is responsible for resolving conflicts in the medical record."  <u>Carmickle v.</u>

27   <u>Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008).  Such conflicts may arise

28   between a treating physician's medical opinion and other evidence in the claimant's record.

1   The Ninth Circuit has held that a treating physician's opinion is entitled to "substantial

2   weight." Bray v. Comm'r, Soc. Sec. Admin., 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting

3   Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988)). A treating physician's opinion is

4   given controlling weight when it is "well-supported by medically accepted clinical and

5   laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

6   in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2). On the other hand, if a treating

7   physician's opinion "is not well-supported" or "is inconsistent with other substantial

8   evidence in the record," then it should not be given controlling weight. Orn v. Astrue, 495

9   F.3d 624, 631 (9th Cir. 2007). Substantial evidence that contradicts a treating physician's

10  opinion may be either (1) an examining physician's opinion or (2) a nonexamining

11  physician's opinion combined with other evidence. See Lester v. Chater, 81 F.3d 821, 830-

12  31 (9th Cir. 1995).

13      If a treating physician's opinion is not contradicted by the opinion of another

14  physician, then the ALJ may discount the treating physician's opinion only for "clear and

15  convincing" reasons. See Carmickle, 533 F.3d at 1164 (quoting Lester, 81 F.3d at 830). If

16  a treating physician's opinion is contradicted by another physician's opinion, then the ALJ

17  may reject the treating physician's opinion if there are "specific and legitimate reasons that

18  are supported by substantial evidence in the record." Id. (quoting Lester, 81 F.3d at 830).

19      According to the record, Plaintiff began treatment with James Diede, M.D., in

20  September of 1997. Plaintiff reported pain in the lower back of his skull which radiated

21  across his head into his right eye and sometimes radiated down his neck. On examination,

22  he demonstrated reproducible pain with pressure over the occipital nerve but did not appear

23  to be in any significant distress, and had full range of motion in his neck and full range of

24  motion, full 5/5 motor strength, and intact sensation in his arms and legs. Dr. Diede assessed

25  Plaintiff with right occipital neuralgia; prescribed narcotic pain medication and nerve pain

26  medication; and administered an occipital nerve block injection. (Tr. at 554-59, 361-63.)

27      Dr. Diede continued to treat Plaintiff between late 1997 and early 2000. His treatment

28  notes indicate that, between late 1997 and early 1999, Plaintiff reported increased pain – at

times rating his pain as a nine or 10 out of 10 (10 being the worst possible pain) – and demonstrated reduced range of motion in his neck.  (Tr. at 352-59, 360, 388-91, 401-04, 482-87, 547, 744-45, 750, 753-54, 759-60, 766-70, 831.)  In late 1998, Dr. Diede diagnosed Plaintiff with cervical facet syndrome and failed cervical spine surgery.  (Tr. at 769-72, 390.)  In April of 1999, Plaintiff underwent a cervical epidural catheter, after which he reported "the most profound relief that he has had in a long time."  Plaintiff said his pain never rose to an eight out of 10, and commonly stayed between a two and four out of 10.  Dr. Diede observed that Plaintiff "demonstrate[d] greater cervical spine range of motion ... than he had previously be able to demonstrate."  (Tr. at 777.)  Dr. Diede performed a second cervical epidural catheter in July of 1999.  (Tr. at 381-83.)  In September of 1999, Plaintiff rated his pain as a one out of 10, and said that he was "feeling the best he has felt in quite a long time." (Tr. at 378.)  Plaintiff continued to acknowledge "profound improvement" in December of 1999.  (Tr. at 376-77.)  In April of 2000, Plaintiff reported that his pain varied from a three to a seven out of 10; Dr. Diede administered another cervical epidural catheter.  (Tr. at 374-75, 398-99.)

In September of 2000, Plaintiff reported increased symptoms.  Dr. Diede noted that Plaintiff experienced "significant improvement" after past epidural steroid catheters, and scheduled Plaintiff for another procedure.  (Tr. at 370-72.)  Dr. Diede completed the procedure in November of 2000.  (Tr. at 266-67.)  In January of 2001, Plaintiff reported "an outstanding five week period of tremendous improvement in pain."  He said that "some" neck pain and limitations in motion had returned, but denied arm pain and said that the neck pain was "not of a consistent nature in a high intensity," and that it was "still managed or blunted significantly with his pain medication."  (Tr. at 793.)

In February of 2001, Plaintiff reported that he had been "doing rather well with almost no average Vicodin consumption for breakthrough pain up until this last weekend when he had to do some moving of boxes."  Dr. Diede noted that, while Plaintiff currently rated his pain as a nine out of 10, "there is a reason for it."  (Tr. at 794.)  In April, Plaintiff said that his pain was "stable" in the range of five to seven out of 10, and was presently a six.  (Tr. at

795, 796-97.)  In July of 2001, Dr. Diede noted that Plaintiff was on a "[b]asic maintenance" program of neurotonin and methadone for pain control, but had not required any increases in methadone, and was "doing well" with a sleeping pill.  (Tr. at 798-99.)

In September of 2001, Plaintiff reported increased pain and "a much greater problem with limitation of lifestyle."  (Tr. at 800.)  Dr. Diede administered another epidural steroid catheter.  (Tr. at 463-65.)  Plaintiff subsequently reported "improvement in relief," "global decrease in the pain intensity," and improved sensation and grip strength in his hands.  (Tr. at 804, 806.)  In December of 2001, Plaintiff reported increased incidents of breakthrough head pain, stating that he had experienced pain at a 10 out of 10 six times in the past month, but at other times had "no significant pain and w[ouldn't] even take [a] Vicodin breakthrough pill."  Dr. Diede adjusted his medication.  (Tr. at 806.)  In April of 2002, Plaintiff reported that he was "doing quite well" with a non-steroidal anti-inflammatory medication.  (Tr. at 808.)

Dr. Diede performed cervical facet block injections in July of 2002.  (Tr. at 260-62.) Plaintiff subsequently reported "a tremendous amount of relief of pain," and stated that the injections "stopped the cervicogenic headaches he was getting."  (Tr. at 822.)  In of October, Plaintiff acknowledged that "he still ha[d] excellent range of motion and good pain control." (Tr. at 451.)  In November, Plaintiff reported that his pain averaged a three or four out of 10, but that it was "inching upwards after a long drive back [to Phoenix] from Austin, Texas." Plaintiff also reported increased muscle tightness in the left side of his neck, but acknowledged that his range of motion was improved.  (Tr. at 823.)  In December, Plaintiff reported increased muscle tightness and "some increase in occipital headaches that occur fairly frequently especially in the middle and later part of the day."  Dr. Diede administered a trigger point injection and noted that, if Plaintiff's symptoms worsened, he might need a repeat cervical epidural.  (Tr. at 805.)

Dr. Diede continued to treat Plaintiff after Plaintiff's December 31, 2002 date last insured.  He administered a cervical facet block injection in April of 2003, after Plaintiff

reported that his neck pain had increased to six out of 10.  (Tr. at 428, 258-59.)  Plaintiff acknowledged a "substantial decrease[]" in headaches and neck pain following the April injection.  (Tr. at 251-52.)  Plaintiff underwent additional cervical facet block injections in July of 2003.  (Tr. at 253-55.)  During this time period, Plaintiff said that his pain control was "actually not nearly as good from a pharmacologic standpoint as it used to be since his pharmacy has switched" the brand of his narcotic pain medication.  (Tr. at 251-52.)  Dr. Diede later noted that he had taken Plaintiff off methadone at the request of the insurance company, but that "relief was not as well covered" on the new medication.  Dr. Diede opined that Plaintiff's best pain relief came from a combination of methadone and vicodin, (Tr. at 249-50, 429-36, 454), as prescribed prior to Plaintiff's date last insured.  (Tr. at 793-95, 805, 807, 822.)

Dr. Diede continued to treat Plaintiff between October of 2003 and October of 2008.  (Tr. at 233-41, 243-46, 248, 304, 314, 612, 848-50.)  In February 24, 2005, Dr. Diede noted that Plaintiff did not have any cognitive impairment.  (Tr. at 243.)  However, in December of 2005, Dr. Diede provided Plaintiff with a note excusing him from jury duty due to "decreased mental concentration ability and physically unable to endure sitting for a prolonged period of time and hold[] attention."  (Tr. at 241.)  During this time period, Plaintiff lost his insurance coverage and thus was unable to afford outpatient surgical procedures such as injections.  (Tr. at 238, 241.)

As previously indicated, Dr. Diede completed a Medical Assessment of Ability to Do Work Related Physical Activities and a Pain Functional Capacity Questionnaire in November of 2008.  (Tr. at 836-44.)  Dr. Diede opined that Plaintiff could occasionally lift and carry 10 pounds and frequently lift and carry less than 10 pounds; and stand and walk (with normal breaks) for less than two hours and sit (with normal breaks) for about six hours in an eight-hour workday, with the need to alternate sitting and standing every 30 minutes to one hour.  (Tr. at 836-38.)  He noted that Plaintiff was "[u]nable to move cervical spine beyond 30 [degrees] [left] rotation, 45 [degrees] [right] rotation without experiencing pain – neck pain

over cervical facets and cervicogenic occipital cephalgia." (Tr. at 838.) He also opined that Plaintiff experienced headaches "90% of time," (Tr. at 841-42), had severe pain which precluded the ability to function, (Tr. at 839-40), and fatigue which seriously affected his ability to function, (Tr. at 843-44). However, Dr. Diede did not state that the limitations were present on or before Plaintiff's December 31, 2002 date last insured. (Tr. at 836-44.)

After a thorough discussion of the objective medical evidence beginning October 16, 1986, when Plaintiff sustained an injury at work, the ALJ addressed Dr. Diede's 2008 assessment and questionnaire stating, in pertinent part:

> Dr. James Diede, the claimant's treating physician, has opined that the claimant cannot sustain full time work even at the sedentary level due to his pain (Exhibit 14F). However, this opinion is not entitled to significant weight as these extreme restrictions are not supported by the medical record prior to the claimant's date last insured. Additionally, the record fails to show the claimant has persistent muscle spasms and/or bilateral occipital nerve entrapment as noted by Dr. Diede in his report. Further, prior to the claimant's date last insured, Dr. Diede did not perform any mental status examinations or test the claimant's ability to concentrate. As well, the record does not support Dr. Diede's statement that the claimant has headaches that can last for days. Nowhere in his report does Dr. Diede state that the claimant's pain and limitations were of this severity prior to December 31, 2002. For these reasons, Dr. Diede's opinion is not entitled to significant weight.

(Tr. at 22.)

The Court finds that the ALJ properly gave clear and convincing reasons, based on substantial evidence in the record, for discounting the opinion of Dr. Diede. Dr. Diede's completed assessment and questionnaire came nearly six years after the date last insured during which time Plaintiff suffered an L1 fracture pursuant to a motor vehicle accident and was diagnosed and/or treated for corneal abrasions, thoracic spine degenerative disc disease, lumbar spine degenerative disc disease, and compound fracture at L1. While the report details Plaintiff's functional limitations, it does not purport to comment on Plaintiff's condition during the relevant time period.[3]

---

[3] The Court notes that, in general, medical reports should not be disregarded solely because they are rendered retrospectively. See Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988). In fact, retrospective medical reports can be relevant to a prior period of disability. See id. Considerations to be made in whether to give such a report less weight include: whether the report specifically assessed plaintiff's functional capacity prior to the

1   Moreover, contrary to Plaintiff's contention that the ALJ substituted his own judgment

2   for that of Dr. Diede, the ALJ compared the medical evidence both before and after the date

3   last insured and found that Dr. Diede's 2008 opinion was inconsistent with the medical

4   record prior to Plaintiff's date last insured. See Andrews, 53 F.3d at 1041; Magallanes, 881

5   F.2d at 751, 755.  For instance, while Dr. Diede opined that Plaintiff had severe pain which

6   would preclude the ability to function in 2008, the doctor's treatment notes prior to Plaintiff's

7   date last insured demonstrate that Plaintiff's symptoms responded to treatment. (Tr. at 20-21,

8   22; compare Tr. at 793-94, 804, 806, 822 with Tr. at 839.)  And, while Dr. Diede opined that

9   Plaintiff had headaches "90% of time" in 2008, his treatment notes prior to Plaintiff's date

10  last insured show that injections "stopped the cervicogenic headaches he was getting." (Tr.

11  at 22; compare Tr. at 822 with Tr. at 842.)  Thus, to the extent that Dr. Diede's opinion could

12  be read to address Plaintiff's condition prior to December 31, 2002, the ALJ reasonably

13  discounted the opinion.  See Batson v. Comm'r of the Soc. Sec. Admin., 359 F.3d 1190,

14  1195 n.3 (9th Cir. 2004) (ALJ reasonably discounted treating physician opinion on a

15  checklist-style form which was not supported by the physician's notes); Flaten, 44 F.3d at

16  1463-65 (ALJ reasonably rejected a treating physician's retrospective opinion which was

17  inconsistent with contemporaneous medical records).

18  In addition to Dr. Diede's failure to comment on Plaintiff's condition during the

19  relevant time period, the ALJ pointed to specific objective medical evidence to support his

20  rejection of Dr. Diede's 2008 opinion regarding Plaintiff's functional limitations.  The Court

21

22

_____

23  insured's expiration date, whether the medical reports created during the time period at issue

24  made only limited references to limitations in functional capacity; whether intervening
    circumstances such as a car accident exacerbated the medical condition; and whether the

25  retrospective opinion conflicted with the same physician's earlier opinion.  See Johnson v.

26  Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995).  Furthermore, "claimants who apply for
    benefits for a current disability after the expiration of their insured status must prove that the

27  current disability has existed continuously since a date on or before the date that their
    insurance coverage lapsed." Flaten v. Secretary of Health & Human Services, 44 F.3d 1453,

28  1462 (9th Cir. 1995).

1    concludes that the ALJ has supported his decision to reject Dr. Diede's 2008 opinion with

2    specific, clear and convincing reasons and, therefore, the Court finds no error.[4]

3    **B.    Compliance with Social Security Ruling 83-20**

4          Plaintiff argues that the ALJ was required by Social Security Ruling 83-20 to employ

5    the services of a medical expert to establish the onset date of his disability.  Pursuant to

6    Armstrong v. Comm'r, 160 F.3d 587, 590 (9th Cir. 1998), an ALJ must call a medical expert

7    where the onset date of the disability is unclear.  But that requirement only applies where a

8    claimant has been found disabled at some time.  See id.; see also Sam v. Astrue, 550 F.3d

9    808, 809 (9th Cir. 2008) (holding that "SSR 83-20 does not require a medical expert where

10   the ALJ explicitly finds that the claimant has never been disabled").  Here, the ALJ did not

11   find that Plaintiff was disabled at any time, and he found that Plaintiff had not been disabled

12   through the date he was last insured.  Therefore, the ALJ was not required to call a medical

13   expert.  See Lair-Del Rio v. Astrue, 380 Fed. Appx. 694, 696-97, 2010 WL 2170996 (9th Cir.

14   May 28, 2010) (noting that burden of proof remains with claimant to prove disability before

15   expiration of disability insured status, and holding that ALJ did not err in not using a medical

16   expert to determine disability onset where plaintiff was not disabled at any time).

17   **C.    Rejection of Plaintiff's Symptom Testimony**

18         Lastly, Plaintiff argues that the ALJ erred by rejecting Plaintiff's symptom testimony

19   in the absence of clear and convincing reasons for doing so.

20

———————————————

21         [4] To the extent Plaintiff asserts that the ALJ erred because the VE testified that a

22   hypothetical person with the specific limitations identified by Dr. Diede could not sustain
     work, the Court is not persuaded.  A similar argument was rejected by the Ninth Circuit in

23   Stubbs-Danielson v. Astrue, 539 F.3d 1169 (9th Cir. 2008).  There, a vocational expert

24   testified that a person with anything more than a mild limitation with respect to pace would
     be precluded from employment; the examining physician opined that Plaintiff was

25   moderately limited in her ability to perform at a consistent pace.  See id. at 1173-74.  "[T]he

26   ALJ refused to lend any weight to the assessment because it did not address [the claimant's]
     RFC and did not appear to be based on her individual record as a whole.  This represents the

27   type of credibility determination charged to the ALJ which we may not disturb where, as
     here, the evidence reasonably supports the ALJ's decision."  Id. at 1174 (citing Batson, 359

28   F.3d at 1195-96).

1    To determine whether a claimant's testimony regarding subjective pain or symptoms

2    is credible, the ALJ must engage in a two-step analysis.  "First, the ALJ must determine

3    whether the claimant has presented objective medical evidence of an underlying impairment

4    'which could reasonably be expected to produce the pain or other symptoms alleged.'  The

5    claimant, however, 'need not show that her impairment could reasonably be expected to

6    cause the severity of the symptom she has alleged; she need only show that it could

7    reasonably have caused some degree of the symptom.'"  Lingenfelter v. Astrue, 504 F.3d

8    1028, 1036-37 (9th Cir. 2007) (citations omitted).  "Second, if the claimant meets this first

9    test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony

10   about the severity of her symptoms only by offering specific, clear and convincing reasons

11   for doing so.'"  Id. at 1037 (citations omitted).   General assertions that the claimant's

12   testimony is not credible are insufficient.  See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir.

13   2007).  The ALJ must identify "what testimony is not credible and what evidence undermines

14   the claimant's complaints."  Id. (quoting Lester, 81 F.3d at 834).

15   In weighing a claimant's credibility, the ALJ may consider many factors, including,

16   "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,

17   prior inconsistent statements concerning the symptoms, and other testimony by the claimant

18   that appears less than candid; (2) unexplained or inadequately explained failure to seek

19   treatment or to follow a prescribed course of treatment; and (3) the claimant's daily

20   activities."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see Orn, 495 F.3d at 637-

21   39.  The ALJ also considers "the claimant's work record and observations of treating and

22   examining physicians and other third parties regarding, among other matters, the nature,

23   onset, duration, and frequency of the claimant's symptom; precipitating and aggravating

24   factors; functional restrictions caused by the symptoms; and the claimant's daily activities."

25   Smolen, 80 F.3d at 1284 (citation omitted).

26   Having reviewed the record along with the ALJ's credibility analysis, the Court finds

27   that the ALJ made extensive credibility findings and identified several clear and convincing

28   reasons supported by the record for discounting Plaintiff's statements regarding his pain and

1   limitations.   While the extensive treatment notes documented throughout the record
2   convinced the ALJ that Plaintiff "certainly has some chronic pain," the ALJ found that "the
3   objective and clinical findings are not consistent with a condition that is likely to cause the
4   excruciating pain alleged." Thus, the ALJ concluded that Plaintiff's allegations of disabling
5   pain and limitations are not fully supported prior to his date last insured.

6       In his evaluation of Plaintiff's testimony, the ALJ first referenced Plaintiff's
7   complaints of neck pain and right radicular symptoms as a result of Plaintiff's October 16,
8   1986 fall.   The ALJ found that Plaintiff's contemporaneous examination "showed no
9   significant symptoms."  Moreover, the ALJ stated that Plaintiff missed only two days of
10  work "secondary to headache and pain, which is not consistent with his allegations that this
11  was a disabling injury." Further, the ALJ noted that Plaintiff "felt well at that time." (Tr. at
12  18-19.)

13      Next, the ALJ analyzed the results of examinations of Plaintiff's neck and cervical
14  spine in 1996 and 1994, respectively, noting that the findings failed to show any cause for
15  the disabling pain and limitations alleged.  Additionally, the ALJ stated that "despite
16  [Plaintiff's] allegations of continued headaches and neck pain since his October of 1986
17  injury the claimant had a three week vacation in Phoenix in ... 1991[, and] ... was swimming
18  2-3 times a week," in June of 1990 and continued to work.  (Tr. at 19.)

19      The ALJ continued his discussion listing the extensive treatment Plaintiff received for
20  his complaints of pain from 1996 through 2003, (Tr. at 19-20), and contrasted Plaintiff's
21  allegations with the objective medical evidence stating, in pertinent part:

22          The objective findings fail to show any surgical complications, central canal
            stenosis or nerve root impingement that would be likely to cause the disabling
23          pain and limitations alleged by the claimant.  The claimant testified at the
            hearing that there had been a misalignment of his fusion plating; however, x-
24          rays showed a solid fusion at C5-C6-C7 with no obvious acute abnormalities
            (Exhibit 14F, page 312).  The lack of objective findings is not consistent with
25          his allegations of disabling pain.

26          Furthermore, the clinical findings since his surgery are not supportive of a
            condition that is likely to cause the severity of pain alleged.  The claimant was
27          examined in March of 1999 by [Dr. Diede], whom he saw frequently for his
            complaints of chronic right neck pain.  He had pain with cervical range of
28          motion with rightward rotation.  Strength in his left flexor-extensor group was

4/5 on the right and on the left was between 4-5/5 (Exhibit 10F, page 87). Examination in September of 1999 and April 2000 showed neck pain with right rotation, but no evidence of cervical radiculopathy (Exhibit 10F, pages 73, 77). In September of 2000 it was noted the clamant had good forearm flexion strength but extension strength was subtly weaker. Grip strength was significantly weaker on both his left and right side. Biceps tendon reflexes could only be elicited from the left side. Coracobrachialis were absent or trace (Exhibit 10F, page 70). Examination in January of 2002 showed a little tenderness on palpation over the lateral recess of the cervical facets at C5 and C6 on the left side, more provacative on the right side (Exhibit 13F, page 89). Clinical examination in November of 2002 showed no pain [that] radiated into his upper extremities and no upper extremity dysesthesia (Exhibit 13F, page 404). In June of 2003 there was again right sided neck pain with rotation to the right. However, his deep tendon reflexes were active and equal (Exhibit 10F, page 24). These findings fail to convince the undersigned that the claimant's pain was as severe as alleged. There was no motor weakness, atrophy, radicular neurological deficits or persistent findings of depressed reflexes.

(Tr. at 20.)

Lastly, the ALJ compared Plaintiff's statements in the contemporaneous medical record with his testimony at the hearing alleging disabling pain. The ALJ found that contrary to his hearing testimony, in September of 1999, Plaintiff rated his pain intensity as a one out of 10 (10 being the worst possible pain); in April of 2000, Plaintiff reported that his pain varies between three–seven out of 10; in January of 2002, he rated his pain as a three out of 10; in April of 2002, he reported a four out of 10; and in November of 2002, Plaintiff indicated the severity of his pain was stable at three–four out of 10. (Tr. at 20-21.) Additionally, the ALJ stated that Plaintiff "was not completely forthright regarding his work activities after his alleged onset date of disability." While Plaintiff initially testified that he stopped working in 1997, and had not worked since the alleged onset of disability in June of 2000, the record shows that he worked (from home) as recently as 2003. (Tr. at 21.) Plaintiff reported that he was "'currently able to function and live on his own and work,'" as the ALJ correctly noted. (Tr. at 21.)

The multiple inconsistencies between Plaintiff's assertions and the record provide a valid basis for discounting Plaintiff's subjective statements. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010) (ALJ reasonably discredited a claimant's statements by identifying inconsistencies between his hearing testimony and the record); see also Carmickle, 533 F.3d

at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.") (citation omitted); <u>Batson</u>, 359 F.3d at 1197 (lack of objective medical evidence supporting claimant's allegations supported ALJ's finding that claimant was not credible).

In summary, the ALJ provided a sufficient basis to find that Plaintiff's allegations of disabling pain and limitations were not fully supported prior to his date last insured. The Court concludes that the ALJ has supported his decision to discredit Plaintiff's allegations with specific, clear and convincing reasons and, therefore, the Court finds no error.

## V. CONCLUSION

Substantial evidence supports the ALJ's decision to deny Plaintiff's claim for disability insurance benefits in this case. The ALJ gave clear and convincing reasons, based on substantial evidence in the record, for discounting the Dr. Diede's opinion, and properly discredited Plaintiff's credibility providing clear and convincing reasons supported by the record for discounting Plaintiff's statements regarding his pain and limitations. Consequently, the ALJ's decision is affirmed. Based upon the foregoing discussion,

**IT IS ORDERED** that the decision of the ALJ and the Commissioner of Social Security be affirmed;

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly. The judgment will serve as the mandate of this Court.

DATED this 25th day of September, 2012.

Michelle H. Burns
United States Magistrate Judge